IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| CHARLES HEGDAHL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 2:03-CV-0410 |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| Commissioner of Social Security, | § | |
| | § | |
| Defendant. | § | |

## REPORT AND RECOMMENDATION
## TO AFFIRM THE DECISION OF THE COMMISSIONER

Plaintiff CHARLES HEGDAHL brings this cause of action pursuant to 42 U.S.C. §

405(g), seeking review of a final decision of defendant MICHAEL J. ASTRUE, Commissioner

of Social Security (Commissioner), denying plaintiff's application for supplemental security

income benefits (SSI).  For the reasons hereinafter expressed, the undersigned United States

Magistrate Judge recommends the Commissioner's decision finding plaintiff not disabled and

not entitled to benefits be AFFIRMED.

I.
PROCEEDINGS

On March 29, 2000, plaintiff filed a Disability Report with the SSA.  (Tr. 169-78).  In his

report, plaintiff averred he could speak English, could read English,[1] and could write more than

_____

[1]In a Disability Supplemental Interview Outline, plaintiff avers he "can't hardly read."  (Tr. 196).

his name in English.  (Tr. 169).  As illnesses, injuries or conditions limiting his ability to work,

plaintiff alleged "[b]ad back, gets dizzy, light headed, gets black out spells when sneezes."  (Tr.

170).  Plaintiff alleged his conditions limited his ability to work by stating, "bad heart, has blood

pressure goes up."  Plaintiff alleged his condition first bothered him on April 20, 1999 and that

he became unable to work and stopped working on that same date after he was hurt on the job.

Plaintiff indicated he had not been seen by a doctor/hospital/clinic or anyone else for emotional

or mental problems that limited his ability to work.  (Tr. 172).  Plaintiff indicated he completed

the 11th grade[2] and did not attend special education classes.  (Tr. 176).  Plaintiff identified past

work as a tree trimmer, wood chipper and a cottonseed hull bagger, working 40 hours a week,

for 5 days a week.  (Tr. 171, 179-81).  Plaintiff included the remark:

> I need to get on disability because I will help my wife with our bills, so I can get
> back on our feet.  If I do work I am afraid I will be in a wheel chair the rest of my
> life.  I have too many bones broken from motorcycle wrecks and car wrecks.  I
> have pins in my hips and in left shoulder blade.

On May 2, 2000, plaintiff filed an application for SSI alleging he became disabled on January

15, 1999 due to "back problems, heart murmur."[3]  (Tr. 118-30).  At the time he filed his

application, plaintiff was 45-years-old.

On April 10, 2001, the SSA, identifying plaintiff's primary diagnosis as "disorders of

back, discogenic & degenerative" and secondary diagnosis as "osteoarthritis and allied

disorders" denied plaintiff benefits determining plaintiff's condition was not severe enough to

---

[2]Plaintiff's education is identified as a 10th grade education in other portions of the record, (Tr. 12, 382), and plaintiff testified at the hearing that he attended school "[u]ntil about the tenth grade."  (Tr. 46).

[3]Plaintiff filed a previous application for SSI on July 16, 1999 alleging an onset date of January 15, 1999.  (Tr. 114-16).  Such application was denied September 2, 1999.  (Tr. 89).  Plaintiff sought untimely reconsideration of this denial on September 22, 2000 because "NH received no notice."  (Tr. 95).  Plaintiff alleged his back pain had worsened, he had no feeling in his left leg, and he may also have a "hole in heart."  (Tr. 187).  Plaintiff alleged he could not lift heavy items and that a physician had restricted him from lifting more than 5 pounds.  Plaintiff also alleged he could not bend or stoop.

keep him from working.[4]  (Tr. 90, 97-99).  On April 30, 2001, plaintiff, through a non-attorney

representative, requested the SSA reconsider its initial determination, explaining he did not agree

with the determination because he could not work "due to multiple impairments."  (Tr. 100).  In

describing any changes in his condition, plaintiff averred he was "having more pain in lower

back & both legs, hands & legs go numb, falling more often."  (Tr. 199).  In describing his

physical limitations, plaintiff stated he was "more limited in sitting, standing & walking" and

had to rest more often.  (Tr. 199, 201).  Plaintiff acknowledged no physician had placed him on

any restrictions since he had filed his claim.  On May 18, 2001, the SSA, identifying plaintiff's

primary diagnosis as "disorders of back, discogenic & degenerative" and his secondary diagnosis

as "osteoarthrosis and allied disorders," denied plaintiff benefits upon reconsideration.[5]  (Tr. 91,

101-03).

On June 14, 2001, plaintiff requested a hearing before an Administrative Law Judge

("ALJ"), explaining he disagreed with the determination on reconsideration because he could not

work "due to multiple impairments."  (Tr. 104).  Plaintiff explained he could not sleep at night,

---

[4]In denying SSI benefits, the SSA explained, "We have determined that you are not entitled to Supplemental Security Income payments based on the claim you filed. . . . We have determined that your condition is not severe enough to keep you from working. . . . You said that you are unable to work because of bad back, dizziness, light headiness, black outs, heart problems and HBP [high blood pressure]. The medical evidence shows the following: Although you have pain and discomfort in your back as well as other joints, you can move them well enough to do some types of work. While you occasionally have some chest pain, there is no evidence of a severe problem with your heart. Your blood pressure has not caused severe problems with your general health. Medical evidence does not show any other impairments which keep you from working. We realize that your condition keeps you from doing any of your past work, but it does not keep you from doing other work which is less demanding. Based on your age, education and past work experience, you can do other work." (Tr. 97-99).

[5]In again denying SSI benefits, the SSA explained, "We find that the previous determination denying your claim was proper under the law. . . . You said that you are unable to work because of back pain, dizziness, lightheadedness, blackouts, heart problems and High Blood Pressure. The medical evidence shows the following: Although you have occasional blackouts and some dizziness, these do not happen frequently enough to prevent you from doing some types of work. You should avoid dangerous moving machinery and unprotected heights. Although you are experiencing pain in your back, you are able to sit, stand, bend, and walk well enough to do some types of work. While you occasionally have some chest pain, there is no evidence of a severe problem with your heart. Medical evidence does not show any other impairments which keep you from working. Your condition prevents you from doing your past work, but it does not prevent you from doing other work which is less demanding." (Tr. 101-03).

that his legs were "giving out" on him, and that when he stood for too long his hands would go numb. (Tr. 205). As functional limitations, plaintiff averred he was unable to walk long distances, stand for long periods of time, or lift more than 10 lbs. (Tr. 208).

On September 13, 2002, the ALJ conducted an administrative hearing in this case.[6] (Tr. 40-88). At the hearing, as relevant to grounds raised in this proceeding, plaintiff testified he attended school "[u]ntil about tenth grade" and did not obtain his GED. (Tr. 46). He testified that in his varied history of heavy labor, he did not supervise any other employees, and was assisted by his bosses in filling out time sheets. (Tr. 51). Plaintiff testified he had previously had a driver's license, but currently did not. (Tr. 54-55). He also testified he had not been hunting or fishing since March 2000, and had not been on any trips since that time except to attend the hearing. (Tr. 56-59). Plaintiff testified that once a week, he would spend about two hours putting car models together. (Tr. 60-61). Plaintiff also testified he has problems with memory, and "problems understanding questions when someone's talking to [him] trying to give answers" such as at the hearing. (Tr. 76). Plaintiff testified he has headaches about once a week and occasional black out spells and dizziness. (Tr. 78-79). Plaintiff testified he can read, but "[n]ot very good," that he never does any reading and could not read the newspaper, and if he has to fill out forms, someone else assists him. (Tr. 81). Plaintiff testified he cannot write down a phone message, but could write down a phone number and sign his name. Plaintiff explained he "mostly faked it through school" and attended regular classes. (Tr. 82).

At the hearing, as relevant to the issues of this case, the ALJ posed the following

---

[6]At the hearing, plaintiff also alleged depression as a "problem." (Tr. 34, 41-42, 48).

hypothetical to the VE:

> [A]ssume a hypothetical person of the same age, education, sex, background
> training and experience of this claimant. . . . [A]ssume that such a hypothetical
> person can lift 50 pounds maximum, 25 pounds frequently, occasionally climb
> and has need to avoid hazards, unprotected heights, dangerous machinery and so
> forth. . . . [W]ith those limitations and no others, would you expect this
> hypothetical person to be able to perform the past relevant work of this claimant?

The VE replied, "No." (Tr. 83). The VE testified such a person could do other jobs with these

limitations and could perform the "full range of unskilled, light, sedentary work." The VE

testified such a person could perform sedentary, unskilled, SVP 2 work as a clerical mailer (or

addresser or inserter), and that reading and writing would not be a factor. He also testified such

a person could perform sedentary, unskilled, SVP 2 work as a production assembly worker, and

light, unskilled, SVP 2 work as a cafeteria attendant and ticket taker. The VE also testified such

a person could perform medium, unskilled, SVP 2 work as a janitor[7] and a dishwasher. (Tr. 84-

85). The VE further testified that if "all of the testimony exactly as . . . given" were accepted

and used as a limitation, that the occupational base would be eliminated. (Tr. 86).

At the conclusion of the hearing, the ALJ granted the plaintiff's request for a consultative

psychiatric evaluation. On December 30, 2002, plaintiff was examined by Dr. Richard Swink,

Ph.D., a clinical psychologist. In his January 3, 2003 report, Dr. Swink noted plaintiff reported

he repeated several grades in school (including the 5th grade twice), was a poor student, and

attended school to the 10th grade. (Tr. 392). Dr. Swink found intelligence testing revealed

plaintiff had a full scale IQ of 78 and verbal IQ of 73, placing plaintiff within the "Border[line]

intellectual functioning range." His performance IQ of 85 was classified as low average. (Tr.

---

[7]The VE reduced the number of janitorial jobs available by half when limiting the job so as to avoid hazardous
machinery such as a floor buffer.

394).  Plaintiff read at below the 3rd grade level giving a standard score of 52 which is deficient.

(Tr. 395).  Plaintiff was unable to write sentences with correct spelling.  Plaintiff was deficient

on subtests of information and arithmetic, which was consistent with his history of severe

academic problems and learning disabilities.  Dr. Swink found plaintiff's test scores were

suggestive of probable life long left brain problems associated with learning disorders.  Memory

testing revealed plaintiff was borderline on verbal memory and "lower Low Average" on visual

memory, which did not support a diagnosis of a "specific memory disorder beyond that

associated with Borderline intellectual functioning, presence of academic deficiencies and

clinical impressions."  The doctor concluded plaintiff evidenced borderline intellectual

functioning on intellectual and memory tests.  (Tr. 397).  Dr. Swink concluded plaintiff was

deficient, below 3rd grade level, on general reading skills, arithmetic, and expressive writing, all

consistent with his history of retention in public school, early school drop-out, and life long

academic skill problems.

On January 15, 2003, Dr. Swink submitted his capability opinion that plaintiff would not

be able to manage benefit payments in his own interest due to his history of alcohol use and

continued alcohol use.  (Tr. 399).  Dr. Swink also submitted a Mental Medical Source Statement

wherein he found plaintiff had no significant limitations in understanding and memory, either no

limitation or no significant limitation in sustained concentration and persistence, either no

limitation or no significant limitation in social interaction, and either no limitation or no

significant limitation in adaptation.  In assessing plaintiff's functional capacity Dr. Swink noted

evidence of plaintiff's adequate activities of daily living, his borderline intellectual functioning,

and deficient academic skills.  Dr. Swink determined, however, that plaintiff was able to attend,

comprehend and carry-out instructions pertaining to basic tasks.  (Tr. 403).

On March 5, 2003, the ALJ rendered an unfavorable decision, finding plaintiff not disabled at any time through the date of the decision.  (Tr. 25-36).  In his decision, under the section "Evaluation of the Evidence," the ALJ noted he considered "all the evidence of record, including medical evidence, clinical and laboratory tests, statements in the record, and the testimony at the hearing" in determining what impairments interfere with plaintiff's normal physical and mental functioning.  (Tr. 28).  The ALJ noted plaintiff was 48-years-old, had an 11[8] grade education, and past work experience as an iron cutter, tree trimmer, bagger, and bricklayer.  The ALJ indicated plaintiff alleged he became disabled on January 19, 1999 after an accident when a log fell on his back.[9]  The ALJ found plaintiff had not engaged in substantial gainful activity since his onset date.

The ALJ noted a medically determinable impairment, or combination of impairments, is severe "if it significantly limits an individual's physical or mental ability to do basic work activities."  *Citing* 20 C.F.R. § 416.921.  (Tr. 29).  He also noted that "if a severe impairment exists, all medically determinable impairments must be considered in the remaining steps of the sequential analysis."  *Citing* 20 C.F.R. § 416.923.  (Tr. 30).

The ALJ recited various medical records regarding plaintiff's back injury and other incidents involving problems urinating, hip pain, and chest pain.  (Tr. 30).  The ALJ also summarized progress notes and records from Western State Psychiatric Center (WSPC) for the

---

[8]Again, plaintiff's education is identified as a 10th grade education in other portions of the record.  *See footnote 2, supra.*

[9]Other portions of the record indicate an onset date of January 15, 1999.  (Tr. 114).

time period December 4, 2001 to March 7, 2002 as follows:

> The claimant came to the counseling session on December 4, 2001 accompanied by his wife. He used a cane for walking. He reported numbness in his legs and hands and he had had a back injury. He reported seizures and 3 suicide attempts. He had been unable to work for about 5 years. He wanted counseling for depression, citing the fact his father had died in August 2001. He stated he cannot read. A mental status exam on February 4, 2002 revealed the claimant to be sloppily dressed and extremely malodorous. He walked with a cane. His affect was flat and mood appeared depressed. He claimed to have suicidal ideation but no plan, and it appeared he utilized this threat to tug on the heartstrings of his wife and children. There was no evidence of psychotic thinking. His memory was somewhat impaired; intellect was below average; attention and concentration were somewhat impaired. He was oriented in all spheres. Diagnosis were: Axis I: Mood disorder due to severe back trauma with depressive features; rule out a substance abuse disorder; Axis II: antisocial personality disorder; Axis III: Status post major back and leg trauma; Axis IV: Global Assessment of Functioning 50; highest for the past year 60. Prognosis was that if the claimant responded to Celexa that was ordered it would appear to be somewhat fair to good. On March 7, 2002, he stated he was doing much better since taking the Celexa and the depression had lessened and because of that he was less angry and less irritable and pugnacious. Objectively he appeared to be much calmer and did not have a hateful look in his eye. He showed no side effects from the medication.

The ALJ also noted an August 20, 2002 progress note from WSPC wherein plaintiff came in for counseling and "seemed to be doing pretty well." The progress note indicated plaintiff was trying to get out in the community to see his friends and wanted to stay on his medication. (Tr. 31).

The ALJ summarized plaintiff's testimony, including testimony that he could walk one block, stand one hour, sit all day, and lift a coffee cup, as well as testimony that he has memory problems, migraines about once a week for which he takes Aleve, blackouts, dizzy spells, and numbness in the lower part of his back which radiates down his leg.

The ALJ also summarized the December 30, 2002 psychological evaluation of plaintiff by Dr. Swink as follows:

Dr. Swink's evaluation of the claimant was that he was independent in personal daily living skills; he helps with cooking and laundry and has a good friend who comes over. He hunts deer and likes to go fishing. He enjoys playing cards and other games. He makes key chains and necklaces and showed a silver necklace with beads he had made. He states he was a poor student in school. He reported he had been a "biker" for a time traveling about in California. He spent three years in prison after assaulting a policeman in California. He had several drunken driving jail terms since his prison term was served. He occasionally drinks beer but "doesn't abuse it," he stated. He denies ever being an alcoholic, limiting himself to a six pack. He was last inebriated two months ago. He ambulated slowly but made good progress with adequate balance when going down the hall. He was slow to get off surfaces at times and appeared to be somewhat stiff. He did not evidence a thought disorder, hallucinatory activity or delusions during the interview. He was alert, coherent and able to focus on tasks. He had good eye contact and did not appear to be significantly or markedly distressed or physically distressed. He had appropriate mild humor at times and did not appear to be significantly depressed. WAIS-R tests showed a verbal IQ of 73; performance IQ of 85 and full scale IQ of 78. He was within the border intellectual functioning range. Diagnostic impressions were: 1. Mood disorder NOS[10]; 2. Borderline intellectual functioning; 3. Personality Disorder NOS, inadequate, antisocial and borderline features; 4. Rule out alcohol dependence; 5. Rule out malingering. His conditions appeared relatively stable and not likely to change significantly within the coming 12 months. Dr. Swink opined that if the claimant received benefits, a payee would be recommended based on his history of alcohol use, continued alcohol use and arrest record. The Mental Medical Source Statement was completed by Dr. Swink regarding the claimant's capacity to sustain work activity over a normal workday and workweek on an ongoing basis. Dr. Swink found the claimant had either "no limitations" or "no significant limitations" in the following: understanding and memory; sustained concentration and persistence; social interaction; and adaptation.

The ALJ specifically gave "great weight" to Dr. Swink's assessment as it was "consistent with the objective evidence," and concluded plaintiff did not have a severe mental impairment. (Tr. 32).

The ALJ found the medical evidence indicated plaintiff has impairments of (1) degenerative disc disease, and (2) syncopal episodes. The ALJ found these impairments were

---

[10]NOS refers to "not otherwise specified" and is indicated when a behavioral pattern does not exactly match a specified disorder, but nevertheless has characteristics of the disorder.

severe within the meaning of the Regulations, but that such impairments were not severe enough
to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations
No. 4.

The ALJ noted he gave full consideration, both individually and in combination, to
plaintiff's subjective complaints.  The ALJ noted, however, that given plaintiff's allegations of
totally disabling symptoms, "one might expect to see some indication in the treatment records of
restrictions placed on the claimant by the treating doctor."  The ALJ found the record included
evidence "strongly suggesting" plaintiff had exaggerated his symptoms and limitations, listing
plaintiff's ability to help with household chores, visit friends, go fishing and hunting, and
participate in hobbies.[11]  After noting other inconsistencies, the ALJ concluded plaintiff
exaggerated his symptoms to include disabling pain, and that there was no objective evidence in
the record which could account for plaintiff's allegations of pain and alleged inability to engage
in substantial gainful activity.  The ALJ thus found the impact of plaintiff's impairment on his
ability to work were not entirely credible in light of the objective medical evidence.

The ALJ determined plaintiff retained the residual functional capacity (RFC) to perform
a "significant range of light work."[12]  (Tr. 35).  The ALJ clarified that plaintiff retained the RFC
to:

> [L]ift/carry no more than 20 pounds occasionally or 10 pounds frequently, stand
> and/or walk (with normal breaks) about 6 hours in an 8-hour workday; sit (with
> normal breaks) for a total of about 6 hours in an 8-hour workday; push and/or pull
> (including hand and/or foot controls) unlimited, other than as shown for lift or

---

[11]Plaintiff testified at the hearing that he had not gone hunting or fishing since March 28, 2000, his protected filing
date.  (Tr. 59).

[12]At a later point in his decision, the ALJ subsequently indicated plaintiff's RFC was for "no more than a *limited* range
of light work."  (Tr. 33).  The ALJ, however, again referred to plaintiff's RFC for a "*significant* range of light work."  (Tr. 34,
35).

carry; can occasionally climb; must avoid hazards such as unprotected heights
and dangerous machinery.

(Tr. 33, 35).

In determining whether plaintiff could perform any of his past relevant work, the ALJ
noted the VE's testimony that plaintiff's past work was performed at the heavy or very heavy
exertional level.  As plaintiff's RFC was for light work, the ALJ determined he could not
perform any past work.

In determining whether there were other jobs existing in significant numbers in the
national economy that plaintiff could perform, the ALJ noted plaintiff was 48 years old, defined
as a younger individual in the regulations.  The ALJ also found plaintiff had a "limited
education," and no transferable skills from any past relevant work.  (Tr. 33).  The ALJ noted
plaintiff's ability to perform all or substantially all of the requirements of light work was
impeded by additional exertional limitations.  (Tr. 34, 35).  The ALJ noted that in response to his
inquiry as to whether jobs exist in the national economy for an individual of plaintiff's age,
education, past relevant work experience and RFC, the VE replied that, assuming the
hypothetical individual's specific work restrictions, plaintiff was capable of making a vocational
adjustment to other work, *viz.*, as a cafeteria attendant and a ticket taker (unskilled, light jobs), or
a clerical mailer and a production assembly worker (unskilled, sedentary jobs).  The ALJ then
concluded, based on the testimony of the VE, and considering plaintiff's age, educational
background, work experience, and RFC, plaintiff was capable of making a successful adjustment
to work that exists in significant numbers in the national economy.  (Tr. 34).  The ALJ thus
reached a finding of "not disabled" within the framework of Medical-Vocational Rule 202.17,
and concluded plaintiff was not under a disability as defined in the Social Security Act at any

time through the date of his decision and was not eligible for SSI payments.

With his request for review of the ALJ's decision, plaintiff, represented by a non-attorney representative, attached a brief arguing plaintiff's mental and physical impairments prevent him from working on a sustained basis.  Plaintiff submitted additional medical records from Western State Psychiatric Center.  (Tr. 11, 12-15, 16-24).  Upon the Appeals Council's denial of plaintiff's request for review on October 9,  2003, the ALJ's determination that plaintiff was not under a disability became the final decision of the Commissioner.  (Tr. 8-10).  Plaintiff now seeks judicial review of the denial of benefits pursuant to 42 U.S.C. § 405(g).

## II.
## STANDARD OF REVIEW

In reviewing disability determinations by the Commissioner, this court's role is limited to determining whether substantial evidence exists in the record, considered as a whole, to support the Commissioner's factual findings and whether any errors of law were made.  *Anderson v. Sullivan*, 887 F.2d 630, 633 (5th Cir. 1989).  Substantial evidence is "such relevant evidence as a responsible mind might accept to support a conclusion.  It is more than a mere scintilla and less than a preponderance."  *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001).  To determine whether substantial evidence of disability exists, four elements of proof must be weighed: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) claimant's subjective evidence of pain and disability; and (4) claimant's age, education, and work history.  *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (citing *DePaepe v. Richardson*, 464 F.2d 92, 94(5th Cir. 1972)).  If the Commissioner's findings are supported by substantial evidence, they are conclusive, and the reviewing court may not substitute its own judgment for that of the

Commissioner, even if the court determines the evidence preponderates toward a different finding.  *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980).  Conflicts in the evidence are to be resolved by the Commissioner, not the courts, *Laffoon v. Califano*, 558 F.2d 253, 254 (5th Cir. 1977), and only a "conspicuous absence of credible choices" or "no contrary medical evidence" will produce a finding of no substantial evidence.  *Hames v. Heckler*, 707 F.2d at 164. Stated differently, the level of review is not *de novo*.  The fact that the ALJ <u>could</u> have found plaintiff to be disabled is not the issue.  The ALJ did not do this, and the case comes to federal court with the issue being limited to whether there was substantial evidence to support the ALJ decision.

III.
<u>MERITS</u>

Plaintiff's brief presents the following issues for review:

1.  The ALJ's finding that plaintiff's mental impairment was not severe at Step Two is not supported by substantial evidence because:

    a.  the ALJ failed to utilize the proper legal standard under *Stone v. Heckler* in evaluating the severity of plaintiff's mental impairment;

    b.  the ALJ failed to evaluate plaintiff's mental impairment and make the necessary findings required by 20 C.F.R. § 416.920a; and

    c.  the medical evidence of record demonstrated plaintiff's mental impairment is severe.

2.  The ALJ's finding that plaintiff can perform other work, given his RFC, is not supported by substantial evidence because plaintiff's mental impairment was not incorporated into the hypothetical posed to the VE; and

3.  The ALJ's finding that plaintiff has a "limited education" is not supported by substantial evidence because the medical evidence of record demonstrated plaintiff has "marked academic deficiencies," including a 3rd

grade reading level.

Although plaintiff presents several points of error as set forth above, the points presented all relate to plaintiff's contention that the ALJ's finding, at Step Two, that plaintiff's mental impairment was not severe, and the resultant failure of the ALJ to incorporate a severe mental impairment from Step Two as a limitation in the subsequent steps of the five-step sequential analysis is error and warrants reversal. This Court's review will focus on whether there was substantial evidence in the record as a whole supporting the finding that plaintiff does not have a mental impairment or combination of impairments that are severe and whether the proper legal standards were applied in making this determination. If it is determined that plaintiff does, in fact, have a severe mental impairment, then it must be decided whether reversal is appropriate.

A.
Proper Standard for Severity Under *Stone v. Heckler*

Plaintiff argues the ALJ's finding that plaintiff's mental impairment was not severe at Step 2 is not supported by substantial evidence because the ALJ failed to evaluate plaintiff's mental impairment using the proper legal standard for determining severity. Plaintiff notes the ALJ did not reference the correct "slight abnormality" standard for determining severity and, in fact, cited the improper "significantly limits" standard. Plaintiff concludes the ALJ's failure to set forth and apply the correct legal standard for determining the severity of his mental impairments was reversible error.

Step 2 of the Commissioner's sequential analysis requires that the ALJ decide whether the claimant's impairment is "severe," irrespective of age, education and work experience. Regulations define the scope of the term "severe impairment":

> "If you do not have any impairment or combination of impairments which *significantly limits* your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled."

20 C.F.R. §§ 404.1520(c) & 416.920(c) (emphasis added).  However, in *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985), the 5th Circuit evaluated the severity regulation and determined it was inconsistent with the statutory language and legislative history of the Social Security Administration Act.  *Id.* at 1104.  Noting the severity regulation defined "severe impairment" to include far fewer conditions than the statutory language intended, the Court warned that it could not condone the Commissioner's use of the severity regulation to systematically deny benefits to claimants who otherwise satisfied the statutory criteria.  *Id.*  Although the Court recognized in *Stone* that the ALJ was entitled to follow a sequential process that disposed of appropriate cases at an early stage, the Court also recognized it was impermissible to conduct the evaluation in such a manner as to deny benefits to individuals who were, in fact, unable to perform "substantial gainful activity."  *Id.* at 1103.  In that regard, the Court clarified the proper standard to be utilized in determining whether a claimant's impairment was severe:

> [A]n impairment can be considered as not severe <u>only if</u> it is a *slight abnormality* [having] such *minimal effect* on the individual that it would *not be expected to interfere with* the individual's *ability to work*, irrespective of age, education or work experience.

*Id.* at 1101 (emphasis added) (quoting *Estran v. Heckler*, 745 F.2d 340, 341 (5th Cir.1984)).  In disapproving the Commissioner's use of the severity regulation,[13] the Court held it would

---

[13]Despite the Court's disapproval, the Court did not go so far as to hold that the severity regulation was facially invalid.  Although the severity regulation, if taken literally, is clearly inconsistent with the conclusion in *Stone* that a claimant need only prove his or her impairment is something more than a slight abnormality, the Court did not, in *Stone* or thereafter, expressly reject the validity of the severity regulation.  In fact, the Fifth Circuit, like other circuits, conceded that the Commissioner may require the claimant to make a *de minimis* showing that her impairment is severe enough to interfere with her ability to work.  *See Hampton v. Bowen*, 785 F.2d 1308, 1311 (5th Cir. 1986) (acknowledging that "Stone does not require a wholesale remand of all severity cases"); *see also McDonald v. Secretary of Health and Human Services*, 795 F.2d 1118, 1122

"*assume* that the ALJ and the Appeals Council have applied an *incorrect standard* to the severity requirement <u>unless</u> the *correct standard is set forth* by reference to this opinion or another of the same effect . . . ." *Id.* at 1106. In *Stone*, the Court found the ALJ applied the wrong legal standard in determining the plaintiff's impairment was not severe because the standard used did not consider the ability or inability of the claimant to engage in substantial gainful activity.

As present 5th Circuit case law stands, an ALJ's reference to *Stone*, or his express statement that the construction the 5th Circuit gives to 20 C.F.R. § 404.1520(c) was used, is sufficient to prevent the presumption that an incorrect standard was utilized to evaluate the severity of an impairment. In this case, as plaintiff argues, the ALJ did not acknowledge the *Stone* standard in his decision, much less state that the standard set forth in *Stone* was used in his evaluation.

In his reply brief, the Commissioner appears to acknowledge, at least by the omission of any argument otherwise, that the ALJ did not comply with the mandates of *Stone* by referencing the *de minimis* standard of *Stone* or citing to *Stone* or another opinion of the same effect. In evaluating the severity of plaintiff's alleged mental impairments, the ALJ instead relied on the regulation's "significantly limited" definition of nonsevere. Therefore, under *Stone*, it must be presumed the ALJ applied an incorrect standard in determining the severity of plaintiff's mental impairments.

Plaintiff contends that if the incorrect standard is used in determining the severity of an impairment, the case must be reversed and remanded for reconsideration at Step 2. The Commissioner argues the law of the Fifth Circuit does not require reversal and remand for non-

---

(1st Cir. 1986) (recognizing the validity of a *de minimis* screening device).

compliance with *Stone* when a claimant has non-severe impairments and the sequential

evaluation process proceeds beyond Step 2.  The Commissioner contends the language in *Stone*

applies only where the "disposition of the case" was based on non-severity at Step 2, and that

Fifth Circuit case law endorses this interpretation of *Stone*.  The Commissioner argues the *Stone*

mandates do not apply in this case because the ALJ proceeded past Step 2 and ultimately decided

plaintiff's case at Step 5.

    In support of this argument, the Commissioner first cites *Anthony v. Sullivan*, 954 F.2d

289 (1992).  In *Anthony*, the ALJ found the claimant did not have any severe impairments and

stopped his evaluation at Step 2.  On appeal to the district court, the court found the ALJ

evaluated the severity of the claimant's impairments under an incorrect legal standard and

remanded for reconsideration under *Stone*.  On remand, the ALJ considered the severity of the

claimant's impairments under the "slight abnormality" standard of *Stone* and determined, again,

that the impairments were not severe and again stopped his evaluation at Step 2.  Such

determination was affirmed by the district court.  On appeal, the Fifth Circuit was presented with

the issue of whether an interim ruling by the Supreme Court in *Bowen v. Yuckert*, 482 U.S. 137,

107 S.Ct. 2287, 96 L.Ed.2d 119 (1987) upholding the facial validity of the severity regulation

had altered the standard announced in *Stone*.[14]  The *Anthony* court held *Stone* was not

inconsistent with the Supreme Court's holding in *Yuckert*, did not displace prior limitations on

the Commissioner's reliance on the severity regulation, and did not alter the standard by which

---

[14]The court was also presented with the issue of whether the factual finding of non-severity was supported by
substantial evidence.

an impairment is considered severe in the 5th Circuit.[15]

The Commissioner, however, quotes a summation statement from *Anthony* that "*Stone* merely reasons that the regulation cannot be applied to summarily dismiss, without consideration of the remaining steps in the sequential analysis, claims of those whose impairment is more than a slight abnormality," in support of his argument that 5th Circuit law "makes clear that the holdings turn on whether the dispositive resolution of the case was made at step two." If there is merit to the defendant Commissioner's argument, it would be that any *Stone* error at Step 2 would be harmless where the ALJ, notwithstanding the non-severe finding, proceeds past Step 2 and considers the non-severe impairment at Steps 3, 4 and, if appropriate, at Step 5. The *Anthony* court, by its quoted language, did not imply that the proper severity standard of *Stone* need not be utilized when a case proceeds beyond Step 2 if the case proceeds beyond Step 2 only as to other impairments which were considered severe at Step 2, but does not proceed past Step 2 and there is no consideration of the non-severe impairment past Step 2. Stated differently, in a case like this one, where there are both physical and mental impairments, proceeding past Step 2 only as to the physical impairments, without any consideration (of the mental impairments) past Step 2, would not be harmless error under *Stone*.

The Commissioner also cites a footnote in *Jones v. Bowen*, 829 F.2d 524 (5th Cir. 1987),[16]

---

[15]The court held *Yuckert* simply upheld the facial validity of the severity regulation as an appropriate method of streamlining the review process and did <u>not</u> conclude that the severity regulation properly interpreted the statutory requirements or purport to state the proper definition of the term "severe impairment." The court concluded the Secretary [now the Commissioner] applied the proper legal standard in evaluating Anthony's disability claim.

[16]The footnote states:

Appellant also advances the rather disingenuous argument that the district court applied the incorrect legal standard in determining the severity of his impairments, similar to that which we rejected in *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985), in denying benefits because appellant's hypertension was characterized as "mild." While the ALJ correctly concluded that appellant's hypertension was of mild medical severity, he proceeded through the sequential evaluation to conclude at the fourth and fifth levels that appellant could perform past relevant work and could perform a full range of light work activities. We perceive no error

*Chaparro v. Bowen*, 815 F.2d 1008 (1987), and *Loza v. Apfel*, 219 F.2d 378 (5th Cir. 2000), in support of his argument that *Stone* is inapplicable in any case where an ALJ proceeds beyond Step 2.

None of those cases, however, stand solely for the proposition that *Stone* is to be mechanically applied only to cases that are dispositive at Step 2 of the sequential evaluation. Instead, the undersigned finds the requirements of *Stone* are applicable to multiple impairment cases that proceed beyond Step 2, where the sequential evaluation continues only with regard to certain impairments found to be severe at Step 2, but does not continue with respect to the other impairments which were found non-severe under the wrong standard.

In any event, the ALJ should have applied the appropriate *Stone* standard for determining the severity of plaintiff's mental impairments, and should have complied with the requirements of *Stone* in his analysis at Step 2.  The failure of the ALJ to do so was error.  However, as the ALJ considered the medical evidence and testimony concerning plaintiff's mental impairments, including Dr. Swink's post-hearing assessment, and as the ALJ eventually found plaintiff had no limitations or no significant limitations as a result of any mental impairment, the Court must determine whether this *Stone* error was harmless.

B.
Analysis of Mental Impairments under 20 C.F.R. § 416.920a

In a related point, plaintiff also argues error at Step 2 occurred as to the ALJ's finding that plaintiff's mental impairment was not severe because the ALJ failed to evaluate the severity of plaintiff's mental impairments utilizing the special technique described in 20 C.F.R. §

---

similar to that found in *Stone v. Heckler*, where the claimant's request for benefits was prematurely denied based on an improper determination of "non-severity."

416.920a.  Plaintiff contends that where, as here, the medical evidence reveals the presence of a

mental impairment that may affect a claimant's ability to work, the ALJ must follow the specific

procedure set forth in the regulation to evaluate the severity of that mental impairment.  The

regulation requires that the Commissioner:

1.      record the claimant's pertinent signs, symptoms, findings, functional limitations, and effects of treatment contained in the claimant's case record to determine whether a medically determinable mental impairment exists;

2.      if the ALJ determines a mental impairment exists, he must indicate whether certain medical findings which have been found especially relevant to the ability to work are present or absent;

3.      the ALJ must then rate, on a set scale, the degree of functional loss resulting from the mental impairment in the areas of function of activities of daily living; social functioning; concentration, persistence, or pace; and deterioration or decompensation in work or work-like settings.

Following the rating of the degree of functional loss resulting from the mental impairment, the

ALJ must then determine the severity of the claimant's mental impairment.  Plaintiff argues that

if the ALJ does not attach a PRT form to his decision,[17] the ALJ's decision must demonstrate the

appropriate analysis technique was used, as well as contain the required findings.

Plaintiff argues the ALJ failed to include any of the required findings in his written

decision and, therefore, was not in the position to make a proper severity determination at Step 2.

Plaintiff specifically notes the ALJ did not even include plaintiff's diagnosed mental

impairments as a medically-determined impairment, did not point to any contrary medical

evidence to rebut Dr. Swink's diagnosis, or make the required findings.  Plaintiff argues the ALJ

simply found his borderline intellectual functioning was not a severe impairment without making

---

[17]Plaintiff maintains the appropriate technique is reflected in the PRT form.

any supporting findings and that such failure constitutes reversible error.

The Commissioner maintains the failure to specifically follow the special technique for evaluating plaintiff's mental disorder, listing the mandated criteria, as well as the failure to make the specific required findings, is not reversible.  Specifically, the Commissioner contends the ALJ's decision should not be reversed because plaintiff has not shown he was prejudiced by the ALJ's failure to specifically detail the evaluation contemplated under 20 C.F.R. § 416.920a.  The Commissioner contends plaintiff cannot show prejudice because the ALJ fully analyzed and discussed all of plaintiff's mental records.  He further notes that after detailing Dr. Swink's report, the ALJ "gave great weight to Dr. Swink's assessment" and "clearly adopted" the assessment regarding "no limitations" or "no significant limitations" in plaintiff's understanding and memory, sustained concentration and persistence, social interaction, and adaptation.  The Commissioner concludes the mere fact the ALJ did not restate, in his own words, the regulatory criteria of the special technique of section 416.920a, does not require reversal.

The ALJ detailed plaintiff's medical records from Western State Psychiatric Center where plaintiff was treated for depression.  He also summarized Dr. Swink's December 30, 2002 psychological evaluation, as well as Dr. Swink's January 15, 2003 Mental Medical Source Statement.  The ALJ gave "great weight" to Dr. Swink's assessment that plaintiff's mental impairments caused "no limitations" or "no significant limitations" in plaintiff's understanding and memory, sustained concentration and persistence, social interaction, and adaptation.  While it is clear the ALJ did not identify each step of the special procedure of section 416.920a, it is equally clear Dr. Swink thoroughly evaluated plaintiff's mental impairments and rated the degree of functional loss attributable to those impairments.  The ALJ gave "great weight" to this

assessment and found it "consistent with the objective evidence."  Consequently, the failure of

the ALJ to make specific findings in his decision with regard to the special procedure of section

416.920a does not appear to have prejudiced plaintiff.  In light of Dr. Swink's assessment, which

was adopted by the ALJ, no reversible error has been shown.

C.
Severity of Plaintiff's Mental Impairment

In another related claim, plaintiff argues the ALJ's finding that plaintiff's mental

impairment was not severe at Step 2 is not supported by substantial evidence because the

medical evidence of record demonstrated plaintiff's mental impairment is severe.  Plaintiff

contends the ALJ's conclusion that a person with borderline intellectual functioning (BIF) and a

verbal IQ of 73 does not have a *severe* mental impairment is contrary to case law and

inconsistent with the Commissioner's own policies.  Citing an 8th Circuit case and a Western

District of Texas case, plaintiff argues that, by definition, BIF has more than a "minimal impact"

on a person's ability to perform basic work activities and should be considered a severe

impairment.  Noting a verbal IQ of 73 is just above the listing level and would be considered

presumptively disabled at just 3 points lower, plaintiff further contends that for the ALJ to

conclude such an IQ level "does not even meet the minimalist definition of severe is contrary to

common sense."  Plaintiff further notes SSA policy manuals state that an IQ from 71-75 may

equal a listing when the severity of his additional impairment is considered.

The Commissioner counters plaintiff's point of error and argues a diagnosis of BIF and

an IQ of 78 does not necessarily mandate a severity finding.  As authority, however, the

Commissioner cites a case which dealt not with a severity determination based on IQ, but on

whether it was a listed impairment.  The Commissioner also argues below average intelligence, by itself, does not constitute a nonexertional limitation.  Defendant's Response, at 15.  The Commissioner maintains there is no evidence in the record to support a finding that plaintiff's BIF has had any impact on his abilities, noting that despite Dr. Swink's diagnosis of BIF, the doctor subsequently found plaintiff had either "no limitations" or "no significant limitations" in understanding and memory, concentration and persistence, social interaction, or adaptation.  Dr. Swink also found plaintiff could comprehend and carry-out instructions pertaining to basic tasks. The Commissioner concludes there is no evidence indicating plaintiff has experienced any effects on his ability to perform light work activity due to mental impairments.

Based on Dr. Swink's report, it does not appear plaintiff has any mental or psychiatric disorders such as depression which are severe, but it does appear his BIF and deficient academic skills are more than slight abnormalities having such a minimal effect on plaintiff that they would not be expected to interfere with his ability to work.  Consequently, plaintiff's diagnoses of these conditions would necessitate a finding of a *severe* mental impairment under the *Stone* standard and upon application of the special technique for analyzing the severity of mental impairments of section 416.920a.  However, Dr. Swink, the same doctor that made such diagnoses, also found plaintiff had no significant limitations in understanding and memory, and either no limitation or no significant limitation in sustained concentration and persistence, social interaction, or adaptation.  In assessing plaintiff's functional capacity, Dr. Swink noted evidence of plaintiff's adequate activities of daily living, his borderline intellectual functioning, and deficient academic skills and determined plaintiff was able to attend, comprehend and carry-out instructions pertaining to basic tasks.  (Tr. 403).  Consequently, even if this Court determines

these intellectual deficiencies should have been found to be severe, this Court must still

determine if such error was harmless.

## D.
### Defective Hypothetical

At the hearing, the ALJ posed the following hypothetical to the VE:

[A]ssume a hypothetical person of the same age, education, sex, background
training and experience of this claimant. . . . [A]ssume that such a hypothetical
person can lift 50 pounds maximum, 25 pounds frequently, occasionally climb
and has need to avoid hazards, unprotected heights, dangerous machinery and so
forth. . . . [W]ith those limitations and no others, would you expect this
hypothetical person to be able to perform the past relevant work of this claimant?

The VE replied, "No." (Tr. 83). The VE testified such a person could do other jobs with these

limitations and could perform the "full range of unskilled, light, sedentary work." The VE

testified such a person could perform sedentary, unskilled, SVP 2 work as a clerical mailer (or

addresser or inserter), and that reading and writing would not be a factor. He also testified such

a person could perform sedentary, unskilled, SVP 2 work as a production assembly worker, and

light, unskilled, SVP 2 work as a cafeteria attendant and ticket taker. The VE also testified such

a person could perform medium, unskilled, SVP 2 work as a janitor and a dishwasher. The VE

further testified that if "all of the testimony exactly as . . . given" were accepted and used as a

limitation, that the occupational base would be eliminated.

Plaintiff argues the ALJ's finding, at Step 5, that plaintiff can perform other work is not

supported by substantial evidence because none of plaintiff's mental impairments were

incorporated into the hypothetical posed to the VE. Plaintiff argues the ALJ is required to

consider all of a plaintiff's impairments in combination, regardless of whether any one of them

may not be considered severe, and that any questions posed to the VE must reasonably reflect all

of a claimant's significant impairments, both severe and non-severe.  Plaintiff argues his BIF was a significant nonexertional impairment that must be considered by the VE.  Plaintiff also argues the VE should have taken his other significant functional and educational limitations into consideration, *viz.*, Dr. Swink's findings in his report that plaintiff was markedly deficient in his fund of information, in his arithmetic abilities, had subtest scores of 4 in his digit span [motor persistence, sustained attention, response speed, and visual-motor coordination], and reads on a 3rd grade level.[18]

Plaintiff maintains the ALJ could not deny benefits unless there was vocational testimony elicited by a hypothetical that reasonably reflected *all* of plaintiff's impairments, and that the ALJ's failure to include any of plaintiff's mental limitations in his hypothetical "created an underlying flaw that undermines his Step Five denial in this case."  Plaintiff concludes the ALJ's failure to pose a complete hypothetical was not harmless because the VE's testimony would most likely have been affected by a proper hypothetical including mental limitations because the cafeteria attendant and ticket taker jobs the VE found plaintiff could perform required the ability to perform detailed tasks, an R2 reasoning level under the DOT.

The Commissioner argues the hypothetical question presented by the ALJ to the VE included all limitations eventually found by the ALJ, and contends no reversible error is present when a hypothetical question reasonably incorporates all of the "disabilities" found by the ALJ. The Commissioner acknowledges the VE testified that an individual would not be able to perform the identified jobs if the individual had the mental limitations to which plaintiff testified (Defendant's Response, at 16), but contends the ALJ considered plaintiff's allegations and

---

[18]Two standard deviations below the norm constitute a marked impairment.  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(6)(c); 20 C.F.R. § 416.926a(e)(2).  A score of 4 constitutes a marked impairment.

properly found his allegations were not supported by the record.  The Commissioner contends no evidence exists to support a finding that plaintiff's alleged educational limitations have any impact on his ability to perform work activities.  The Commissioner argues there is no opinion from any medical source, including Drs. Mason or Swink, finding plaintiff had any limitations due to a mental disorder or lack of educational abilities.  The Commissioner notes the ALJ is not bound by VE testimony which is based upon evidentiary assumptions the ALJ ultimately rejects and argues the ALJ was "not obligated to rely on VE testimony which responded to that limitation, or any other limitation not supported by the record."

The Commissioner acknowledges the limiting effects of all of a claimant's impairments, even those not severe, must be considered in determining the claimant's RFC.  The Commissioner explains that at Step 4 or 5, the severity of any given impairment is not at issue because all impairments must be considered in determining RFC.  The Commissioner concedes that if this Court finds plaintiff's RFC is not supported by substantial evidence because an impairment was not properly considered, then reversal is appropriate.  The Commissioner contends, however, that reversal is not appropriate here because the ALJ's RFC determination is supported by substantial evidence.  He argues the ALJ's decision and the record evidence reveal the ALJ carefully evaluated all of the medical evidence pertaining to plaintiff's alleged mental limitations and properly concluded plaintiff did not have a severe mental impairment.  The Commissioner concludes the ALJ properly determined plaintiff's RFC did not need to account for any mental limitations because none were established by the evidence.

Neither the ALJ or the VE had the benefit of Dr. Swink's evaluation before them when the ALJ presented the hypothetical to the VE at the hearing.  Nor did they have the Mental

Medical Source Statement from Dr. Swink wherein he indicated plaintiff's mental impairments did <u>not</u> significantly limit his ability to perform basic work functions.  The VE did, however, consider plaintiff's academic deficiencies when he testified the job of clerical mailer (or addresser or inserter) did not require reading and writing.  The more prudent action on the part of the ALJ would have been to reopen the hearing after obtaining the psychological evaluation in order to allow a VE to consider the effect of plaintiff's mental impairments of BIF and deficient academic skills on his ability to perform work-related functions.  The failure of the ALJ to do that, however, particularly in light of Dr. Swink's assessment that plaintiff's mental impairments caused no effect or only minimal effect on his ability to perform basic work functions, is not reversible unless plaintiff can show those academic deficiencies would have eliminated the jobs the VE found available.

E.
<u>Educational Deficiencies</u>

In his final point, which is related to the issue discussed in paragraph D. above, plaintiff argues the ALJ erred in finding plaintiff has a "limited education."  The ALJ found plaintiff had an 11th grade education,[19] finding this to be a "limited education."  The regulations define a "limited  education" to mean an "ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs.  We generally consider that a 7th grade through the 11th grade level of formal education is a limited education."  20 C.F.R. § 416.964(b)(3); *see also* 20 C.F.R. § 404.1564(b)(3) (same).  A "limited education" is the third in a hierarchy of four

---

[19]The undersigned again notes the evidence in the record indicates plaintiff attended school only to the 10th grade.  *See footnote* 2, *supra.*

(4) categories specified in the Code of Federal Regulations, to wit: illiteracy, marginal education, limited education, and high school education and above, to be used in evaluating a claimant's education level as a factor in determining whether a claimant can meet vocational requirements. *See* 20 C.F.R. §§ 416.964, 404.1564.

Plaintiff contends the ALJ's finding that he has a "limited education" is not supported by substantial evidence.  Plaintiff acknowledges the grade level (here, the 10th grade) will be used to determine a claimant's education abilities unless there is no other evidence to contradict it, but contends the other evidence of record clearly contradicted a finding that his numerical grade level represents his actual educational abilities.  *Citing* 20 C.F.R. § 416.964(b).  Specifically, plaintiff cites Dr. Swink's findings as evidence that plaintiff's educational level is less than "limited," *i.e.*, he was markedly deficient in his fund of information, in his arithmetic abilities, had subtest scores of 4 in his digit span [motor persistence, sustained attention, response speed, and visual-motor coordination], and reads on a 3rd grade level.[20]  Plaintiff first argues this medical evidence of record demonstrates plaintiff's educational level fell more properly under the category of "illiterate"[21] instead of the "limited education" category as the ALJ found, and concludes the Grids thus created a legal presumption that a significant number of *sedentary* jobs were not available for plaintiff (a person 45-49 years old, with no transferable skills, and illiterate).  *See* Rule 201.17.  Plaintiff argues the ALJ was thus barred from denying benefits on the basis that there were *sedentary* jobs plaintiff could perform, to wit: clerical mailer and

---

[20]Two standard deviations below the norm constitute a marked impairment.  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(6)(c); 20 C.F.R. § 416.926a(e)(2).  A score of 4 constitutes a marked impairment.

[21]"Illiteracy means the inability to read or writ.  We consider someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name.  Generally, an illiterate person has had little or no formal schooling."  20 C.F.R. § 416.964(b)(1).

production assembly worker.

The Commissioner does not specifically address this issue.

The evidence of record does not support the administrative determination that plaintiff had a limited education.  Nor does such evidence show plaintiff to be illiterate so as to require a finding that plaintiff was disabled if limited to sedentary work under Rule 201.17.  Instead, the evidence shows plaintiff to be in the "marginal education" category which indicates an "ability in reasoning, arithmetic, and language skills which are needed to do simple, unskilled types of jobs.  We generally consider that formal schooling at a 6th grade level or less is a marginal education."  20 C.F.R. § 416.964(b)(2).  The fact that plaintiff went to at least the 10th grade and the fact that plaintiff is at the 3rd grade reading level constitutes a marginal educational level, not an illiterate level.  The Grids addressing sedentary and light work, however, do not include the "marginal" educational category.  Instead, they include a category of "limited or less" education, with the additional factor of being "at least literate and able to communicate in English."  *See* Table No. 1.  Consequently, even if the ALJ erred in finding plaintiff to have a "limited education," the ALJ would have been able to find a "marginal education."  Consequently, plaintiff would have a "limited or less" education under the Grids, and would not be presumed disabled under the medical-vocational guidelines.

Plaintiff next appears to argue there was not substantial evidence to support the ALJ's finding that he could perform the identified light, unskilled jobs of ticket taker and cafeteria attendant.  Specifically, plaintiff contends that considering his 3rd grade reading level, he is unable to meet the L2 reading level ability required to perform the job of a ticket taker under the

Dictionary of Occupational Titles (DOT).[22]  Plaintiff also argues that, considering his BIF, he is

unable to meet the R2 reasoning level ability required to perform the jobs of both ticket taker and

cafeteria attendant under the DOT.[23]  Plaintiff contends a VE, if asked to consider all of

plaintiff's documented mental limitations and academic deficiencies, would have eliminated both

the job of ticket taker and cafeteria attendant due to his inability to meet the language and

reasoning development.  Plaintiff maintains "the ALJ's failure to address these matters in his

questioning of the vocational expert was error that necessitates a remand."

The VE, in identifying the sedentary, unskilled job of a clerical mailer as a job plaintiff

could perform, testified <u>that reading and writing would not be a factor</u>.  The VE was clearly

aware of plaintiff's difficulties with reading and writing when he identified these jobs and opined

plaintiff could perform them.

Further, the DOT "lists maximum requirements of occupations as generally performed,

<u>not the range</u> of requirements of a particular job as it is performed in specific settings."  SSR 00-

4p at *3 (emphasis added).  A VE "may be able to provide more specific information about jobs

or occupations than the DOT."  *Id.*  The DOT itself cautions that its descriptions may not

---

[22]L2 states:

Reading: Passive vocabulary of 5,000-6,000 words.  Read at rate of 190-215 words per minute.  Read adventure stories and comic books, looking up unfamiliar words in dictionary for meaning, spelling, and pronunciation.  Read instructions for assembling model cars and airplanes.

Writing: Write compound and complex sentences, using cursive style, proper end punctuation, and employing adjectives and adverbs.

Speaking: Speak clearly and distinctly with appropriate pauses and emphasis, correct pronunciation, variations in word order, using present, perfect and future tenses.

[23]R2 states:

Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions.  Deal with problems involving a few concrete variables in or from standardized situations.

coincide in every respect with the content of jobs as performed in particular establishments or at certain localities, *DOT*, Vol. 1, p. xiii, and argues that not all of the jobs in every category have requirements identical to or as rigorous as those listed in the DOT.  (*citing Hall v. Chater*, 109 F.3d 1255, 1259 (8th Cir. 1996)).  The Fifth Circuit has clarified that while the DOT "simply gives a *general description* of the [job] duties involved," a VE "is familiar with the specific requirements of a particular occupation, including working conditions and the *attributes and skills* needed," and is "able to compare all the unique requirements of a specified job with the particular ailments a [plaintiff] suffers in order to reach a reasoned conclusion whether the [plaintiff] can perform the specific job."  (*quoting Fields v. Bowen,* 805 F.2d 1168, 1170-71 (5th Cir. 1986).

The jobs identified by the VE were all unskilled.  According to the regulations, "unskilled" work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time.  20 C.F.R. §§ 404.1568(a), 416.968(a).  The "simple duties" of unskilled work encompasses both the "simple one- or two-step instructions" of R1 jobs as well as the "detailed but uninvolved written or oral instructions" of R2 jobs.  The VE in this case recognized plaintiff's intellectual limitations, finding that the job of clerical mailer did not involve reading and writing.  Even if plaintiff's contention that the jobs of ticket taker and cafeteria attendant <u>might</u> be eliminated is accepted, the jobs of clerical mailer (5,000 regionally and 80,000 nationally), and production assembly worker (20,000 regionally and 260,000 nationally), remain.  Plaintiff has not demonstrated the light, unskilled jobs identified by the VE are inconsistent with plaintiff's educational level or his language and reasoning level.

Consequently, even though plaintiff has identified and well briefed the errors in the administrative proceedings as outlined above, those errors were harmless in that they did not prejudice plaintiff.  The decision of not disabled should be affirmed.

IV.
RECOMMENDATION

It is the RECOMMENDATION of the undersigned United States Magistrate Judge to the United States District Judge that the decision of the defendant Commissioner finding plaintiff not disabled and not entitled to a period of disability benefits be AFFIRMED.

V.
INSTRUCTIONS FOR SERVICE

The United States District Clerk is directed to send a copy of this Report and Recommendation to each party by the most efficient means available.

IT IS SO RECOMMENDED.

ENTERED this <u>8th</u> day of March 2007.


CLINTON E. AVERITTE
UNITED STATES MAGISTRATE JUDGE


**\* <u>NOTICE OF RIGHT TO OBJECT</u> \***

Any party may object to these proposed findings, conclusions and recommendation.  In the event a party wishes to object, they are hereby NOTIFIED that the deadline for filing objections is eleven (11) days from the date of filing as indicated by the "entered" date directly above the signature line.  Service is complete upon mailing, Fed. R. Civ. P. 5(b)(2)(B), or transmission by electronic means, Fed. R. Civ. P. 5(b)(2)(D).  When service is made by mail or electronic means, three (3) days are added after the prescribed period.  Fed. R. Civ. P. 6(e).  Therefore, any objections must be <u>filed</u> **on or before the fourteenth (14th) day after this**

**recommendation is filed** as indicated by the "entered" date.  *See* 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b); R. 4(a)(1) of Miscellaneous Order No. 6, as authorized by Local Rule 3.1, Local Rules of the United States District Courts for the Northern District of Texas.

Any such objections shall be made in a written pleading entitled "Objections to the Report and Recommendation."  Objecting parties shall file the written objections with the United States District Clerk and serve a copy of such objections on all other parties.  A party's failure to timely file written objections to the proposed findings, conclusions, and recommendation contained in this report shall bar an aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings, legal conclusions, and recommendation set forth by the Magistrate Judge in this report and accepted by the district court.  *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996); *Rodriguez v. Bowen,* 857 F.2d 275, 276-77 (5th Cir. 1988).